## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **W.J. and IRMA SMITH,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL NO. 2:17-CV-0191-CG-B** |
| | ) | |
| **LIQUID TRANSPORT** | ) | |
| **CORPORATION, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>ORDER</u>

This action for personal injury and loss of consortium arises out of an accident involving two commercial motor vehicles. The motions addressed in this Order are:

1) Defendants Liquid Transport Corporation and Great West Casualty Company's (collectively "Defendants") Motion to strike certain testimony of Irma Smith (Doc. 97), Plaintiffs W.J. Smith and Irma Smith's (collectively "Plaintiffs") Response (Doc. 101) and Defendants' Reply (Doc. 104),

2) Defendants' motion to exclude Plaintiffs' expert testimony (Doc. 98), Plaintiffs' Response (Doc. 102) and Defendants' Reply (Doc. 105), and

3) Defendants' Motion for summary judgment (Doc. 88), Plaintiffs' Response (Doc. 94), and Defendants' Reply (Doc. 96).

For the reasons explained below, the Court finds that Defendants' motions to strike, to exclude expert testimony, and for summary judgment are due to be granted.

# I. Factual Background

## A. W.J. Smith's Medical History

Plaintiff W.J. Smith ("Smith") was an active smoker with a history of carotid disease, lung disease, diabetes, and hypertension. (Doc. 94-3, p. 7). Because of his carotid disease, Dr. John Streitman ("Dr. Streitman") performed a coronary artery bypass grafting procedure on Smith in July of 2013. *Id.* at p. 5. Following the procedure, Dr. Streitman diagnosed Smith with left carotid stenosis. *Id.* Symptoms of carotid stenosis include transient ischemic attack, stroke, and loss of vision. *Id.* at p. 6. However, at the time of Smith's bypass in 2013, he was not exhibiting any symptoms. *Id.* Throughout the next few years, Smith periodically visited Dr. Streitman to evaluate the status of his carotid stenosis. *Id.* at pp. 6-9. In April 2015, Dr. Streitman recommended Smith undergo a carotid endarterectomy to reduce his risk of stroke. *Id.* at p. 6. Smith, however, was not interested in having the operation. *Id.* Though carotid disease can contribute to some of the risks of stroke, a carotid endarterectomy is nevertheless an elective operation. *Id.* at p. 7, 22.

## B. The Accident

On May 5, 2015, Smith was operating a tractor-trailer when he was rear-ended by Eddie Williams ("Williams"). (Doc. 94, p. 1). Williams, an agent of Liquid Transport Corporation ("LTC"), was also operating a tractor-trailer. *Id.*

Williams and Smith were both traveling northbound on Interstate 75 in Catoosa County, Georgia at the time of the accident. (Doc. 94-2, p. 13). The posted speed limit on Interstate 75 is 70 miles per hour, and Williams was driving 65 miles per hour. *Id.* At some point during the commute, Smith passed Williams. *Id.* Smith later proceeded to get in front of Williams as each prepared to exit for a weigh station. *Id.*

While Smith was preparing to exit, Williams saw Smith's brake lights illuminate. *Id.* At that point in time, Williams began pressing his brake pedal. *Id.* Williams testified that the traffic in the two lanes beside him "had quite a few cars in it," but he felt there "was more than enough safe distance" between he and Smith. *Id.* However, as Williams was pressing his brake pedal, he realized that his tractor-trailer was not slowing down as fast as it should have been. *Id.* Williams started applying more pressure on the brakes, even to the point that he could see smoke coming from his tires. *Id.* He stood on the brake pedal as hard as he could, but he was unable to avoid impact with Smith's tractor-trailer. *Id.* at pp. 13-14. When he realized he was going to collide with Smith, Williams tried to lessen the impact against Smith's vehicle by hitting Smith at an angle. *Id.* at p. 14. He believes there were no feasible alternative options because there was too much traffic in the lanes on his left, and he would have rolled the vehicle if he had taken the shoulder to his right. *Id.* at pp. 13-14.

Plaintiffs, however, contend Williams should have been able to bring his tractor-trailer to a complete stop. Thus, Plaintiffs assert a vicarious liability claim against LTC for Williams' alleged negligent operation of the vehicle.

**C. Williams' Brake System**

It is undisputed that the right-rear brake drum on Williams' tractor-trailer was missing following the accident. (Doc. 90, p. 19). A few weeks before the accident, the tractor-trailer underwent its 90-day periodic inspection. (Doc. 94-1, p. 19). Additionally, the day before the accident, the tractor trailer was involved in a safety lane inspection by LTC's mechanic. *Id.* Both inspections included checking the brake system. *Id.* Furthermore, the labor involved in the safety lane inspection included adjusting the tractor-trailer's brakes. *Id.* at pp. 23-24. LTC's inspection guides and annual reports did not contain any indication there was some sort of defect in Williams' tractor-trailer at the time of the accident. *Id.* at p. 23.

On the day of the accident, Williams testified the brakes had been functioning normally, and he had not encountered any difficulty stopping the vehicle. (Doc. 94-2, p. 14). Williams performed a pre-trip inspection, which included performing a brake test, and the brakes "felt fine." *Id.* Moreover, Williams had never experienced any problems or observed any complications with the tractor-trailer's brake system prior to the accident. *Id.* at p. 16. Furthermore, throughout the course of his ownership of the tractor-trailer, an inspection has never revealed any issue with the brakes. *Id.*

Plaintiffs, however, contend the brake drum defect existed on the trailer before the pre-accident inspections performed by LTC's mechanic and Williams. (Doc. 94, p. 12). Thus, Plaintiffs have asserted a vicarious liability claim against LTC for the mechanic's and Williams' alleged negligent inspections of the tractor-trailer's braking system. (Doc. 94, p. 12).

### D. Smith's Post-Accident Medical Condition

As a result of the accident, Smith sustained injuries to his neck and back. On July 30, 2015, Smith saw orthopedic surgeon, Dr. Thomas Bernard ("Dr. Bernard"), for neck pain and stiffness. (Doc. 94, p. 18). Dr. Bernard diagnosed him with cervical spondylosis without myelopathy and a cervical strain (i.e. "whiplash"). *Id.* To help alleviate his symptoms, Dr. Bernard recommended physical therapy treatment. *Id.*

Between August 1, 2015 and August 17, 2015, Smith attended three physical therapy sessions with physical therapist Thomas Rider ("Rider"). *Id.* The physical therapy visits included therapeutic exercises, ultrasounds, and massages. (Doc. 94-5, p. 6). On Smith's third visit, Smith revealed to Rider that he had a history of carotid disease. *Id.*

Smith returned to visit Dr. Streitman to evaluate his carotid condition in June 2015, approximately one month following the accident with Williams. (Doc. 94-3, p. 7). At the time of the visit, Dr. Streitman was unaware Smith had been in an accident. *Id.* Dr. Streitman was still of the opinion that Smith would have stroke risk reduction if he underwent the carotid endarterectomy. *Id.* Following a

discussion with Smith about the risks and benefits of the surgery, Dr. Streitman was under the impression that Smith had decided to proceed with the operation. *Id.*

Smith's last physical therapy session with Rider was on August 17, 2015, and Dr. Streitman performed the carotid endarterectomy on September 2, 2015. *Id.* at pp. 10-11. Smith had complications following the endarterectomy, including a stroke that left him paralyzed. *Id.* at pp. 12-13.

Based on the foregoing, Plaintiffs contend Williams' rear-end collision ultimately caused Smith's stroke because Smith was required to undergo the carotid endarterectomy in order to continue receiving physical therapy for his neck. Accordingly, Plaintiffs have asserted a vicarious liability claim against LTC for causing Smith's stroke. Plaintiffs also contend they are entitled to damages amounting to Smith's past and future medical expenses. Thus, they have brought a direct action against Defendant LTC's indemnity insurer, Great West Casualty Company, for indemnification for any sums owed if LTC should become obligated to pay Plaintiffs.

## II. Procedural History

On May 3, 2017, Plaintiffs filed a six-count Complaint against Williams, LTC, Dana Transport, Inc., and Great West Casualty Company for personal injury and loss of consortium. (Doc. 1). Plaintiffs filed an Amendment Complaint (Doc. 30) on July 24, 2017, which became the operative pleading in this case. On September 13, 2017, the parties jointly agreed to a stipulation of dismissal of Defendant Williams and Defendant Dana Transport. (Doc. 50). In accordance with the stipulation of

dismissal, Defendant LTC also stipulated to being held vicariously liable to the extent Williams is found negligent in causing the collision. (Doc. 94-8).

Accordingly, the only remaining issues to be litigated in this case are as follows: Defendants' willfulness or wantonness in causing the collision; Williams' negligent operation of the tractor-trailer; Defendants' negligent inspection of the tractor-trailer's braking system; Defendants' negligence in causing Smith's stroke; and Defendants' liability for Smith's claims for past and future medical expenses. In conjunction with their claims for vicarious liability, Plaintiffs seek indemnification against Defendant LTC's indemnity insurer, Great West Casualty Company, for any sums owed if LTC should become obligated to pay Plaintiffs.

## III. Motion to Strike

Defendants have moved to strike certain testimony of Plaintiff Irma Smith ("Ms. Smith") proffered in Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment. Defendants assert Ms. Smith's testimony includes two out-of-court statements of Smith, and both of those statements are double hearsay. (Doc. 97, p. 1).

### A. Standard of Review

Under the Federal Rules of Evidence, hearsay is defined as a statement "(1) that the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." FED. R. EVID. 801(c). The general rule is that the Court will not consider inadmissible hearsay on a motion for summary judgment. *Jones v. UPS Ground*

*Freight*, 683 F.3d 1283, 1293 (11th Cir. 2012) (citation omitted). However, "a district court may consider a hearsay statement in passing a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form." *Id.* at 1293-94 (citation omitted). "Hearsay within hearsay" (i.e. "double hearsay") is admissible only if each part of the combined statements conforms with an exception to the hearsay rule. FED. R. EVID. 805.

### B. Analysis

Defendants' first objection is to Ms. Smith's deposition testimony that Smith told her "Williams admitted [to Smith] that the collision was his fault." (Doc. 94, p. 7); (Doc. 94-4, pp. 29-30). Defendants contend the statements are inadmissible double hearsay. (Doc. 97, p. 2).

Defendants concede Williams' statement to Smith is an admission by a party opponent, which by definition is not hearsay. (Doc. 97, p. 2) (citing FED. R. EVID. 801(d)(2). However, Defendants take issue with the second statement: Smith's statement to Ms. Smith. Defendants assert Smith's statement to Ms. Smith is an out-of-court statement offered to prove the truth of the matter asserted and does not fall into any hearsay exception under Rules 803 and 804. In response, Plaintiffs do not contest Defendants' argument. (Doc. 101, p. 1). Thus, Ms. Smith's cited testimony will not be considered at the summary judgment stage.

Defendants' second objection is to Ms. Smith's deposition testimony that Smith told Ms. Smith "that [physical therapist] Rider had just told him that he could not continue treating Mr. Smith until Mr. Smith had surgery on his carotid

artery." (Doc. 97, p. 2); (Doc. 94-4, pp. 33-37, 41-42, 49-50, 54). Defendants argue the first statement, Rider's alleged statement to Smith, is offered for the truth of the matter asserted. (Doc. 97, p. 2). Defendants also take issue with the statement because "Rider expressly denies telling Mr. Smith anything along the line that he could not continue physical therapy until having carotid artery surgery." *Id.* Furthermore, Defendants also contend the second statement, Smith's statement to Ms. Smith, is hearsay. *Id.*

In response, Plaintiffs assert the first statement, Rider's statement to Smith, falls under the "present-state of mind" hearsay exception under Rule 803(3). (Doc. 101, p. 4). Plaintiffs urge the Court to disregard Defendants' argument that Rider "expressly denies" making the statement to Smith. Plaintiffs argue the purpose of Rule 803(3) is to show "that contemporaneous statements about a present state of mind will be superior in evidentiary value to the declarant's later testimony on the same point." *Id.* at p. 3. Because Rider is available to testify that Smith's statement is allegedly not true, but Smith is incapacitated and cannot do the same, it is imperative that Rider's testimony is allowed into evidence. *Id.* In the alternative, Plaintiffs also argue the statement tends to prove the effect on the listener (i.e. that Smith believed the only way he could continue therapy was if he had the carotid surgery). *Id.*

As a preliminary matter, the statement is not admissible for the non-hearsay purpose of showing its effect on the listener. The effect on the listener can only be determined by the listener, not someone else. *See Tucker v. Housing Auth. of*

*Birmingham Dist.*, 507 F.Supp.2d 1240, 1269 (Ala. N.D. 2006) (in race discrimination lawsuit, the court admitted Defendant's statements over Defendant's evidentiary objection to hearsay because Plaintiff testified regarding the effect Defendant's comments had on Plaintiff). Plaintiffs have not offered any deposition testimony or sworn statement from Smith in order to determine the effect, if any, Rider's purported statement had on him. Thus, the statement cannot be offered for the truth asserted within it.

Neither is the Court persuaded by Plaintiffs' argument under Rule 803(3). Plaintiffs assert Rider's alleged statement to Smith should be admitted because Rider is available for trial to testify that the statement is allegedly not true. However, Rider has already testified that he never told Smith he was required to have the surgery before he would continue physical therapy on Smith. (Doc. 94-5, p. 14). Thus, there is no "he-said/he-said" discrepancy for the Court to consider. (*See* Doc. 101, p. 3). Furthermore, if Rider's alleged statement to Smith was not offered for the truth asserted in the statement, then it is unclear how the evidence could establish the existence of a serious and significant material fact question to preclude summary judgment. Accordingly, Ms. Smith's cited testimony will not be considered at the summary judgment stage, and Defendants' motion to strike certain portions of Ms. Smith's testimony is due to be granted.

## IV. Motion to Exclude Expert Testimony

Defendants have also moved to preclude Plaintiffs' disclosed expert, Gary Johnson, from testifying or offering opinions regarding (i) the timing and

circumstances of the shattered brake drum and (ii) the adequacy of the brake inspections performed separately by LTC's brake inspector and Williams. (Doc. 98, p. 1). Specifically, Johnson seeks to testify that the brake drum failure occurred "at least several days before the accident," and thus, LTC's mechanic and Williams were negligent in performing their pre-trip inspections. (*See* Doc. 98-2) Defendants assert Johnson is not qualified as an expert on those subjects, and his opinions fail to meet admissibility standards for expert testimony. (Doc. 98, p. 1).

## A. Standard of Review

Under Federal Rule of Evidence 702 ("Rule 702"), expert testimony is admissible if:

> (1) the expert is qualified to testify regarding the subject of the testimony; (2) the expert's methodology is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert* [*v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)]; and (3) the expert's testimony will assist the trier of fact in understanding the evidence or determining a fact at issue. *Chapman v. Proctor & Gamble Distrib.*, *LLC*, 766 F.3d 1296, 1304(11th Cir.2014)(citation omitted).

The Eleventh Circuit has noted that a court may admit expert testimony if the following requirements are met: (1) the expert is "qualified to testify competently regarding the matter he or she intends to address"; (2) the methodology the expert used is reliable, as determined by a *Daubert* inquiry; and (3) the testimony assists "the trier of fact through the application of expertise to understand the evidence or determine a fact in issue." *Kilpatrick v. Breg, Inc.*, 654 F.3d 1329, 1335 (11th Cir. 2010). Though "there is inevitably some overlap among the basic requirements— qualification, reliability, and helpfulness—they remain distinct concepts and the

courts must take care not to conflate them." *Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011) (citation omitted). "[T]he burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion." *Chapman*, 766 F.3d at 1304 (citation omitted).

**B. Analysis**

As a preliminary matter, the testimony Johnson seeks to present is not lay witness testimony; it is expert testimony. Johnson was not present at the time of the accident nor was he an eyewitness to the accident. Rather, he has reviewed various documents, including: photographs of both tractor-trailers involved in the accident, photographs of the suspension and braking components of Williams' tractor trailer, and deposition testimony. Johnson has been specially retained to draw conclusions based on those documents. Under those circumstances, the Court finds the testimony Johnson seeks to offer is expert testimony subject to Rule 702's requirements.

Johnson has formulated two expert opinions regarding the accident. Johnson's first opinion is that the right-rear brake on Williams' trailer was inoperative prior to the day of the crash. (Doc. 98-2, p. 11). Second, Johnson opines that, had the right rear brake been operational, the crash would not have occurred. (Doc. 98-2, p. 11). Defendants seek to exclude Johnson's findings based on his qualifications, the methodology employed in reaching his conclusions, and the helpfulness of his opinions in assisting the trier of fact.

### i. Qualification

Under the qualification prong, an expert witness must be able to competently testify regarding the matters he or she intends to address based on his or her "knowledge, skill, experience, training, or education." *U.S. v. Frazier,* 387 F.3d 1244, 1260-61 (11th Cir. 2004). Even though "an expert's overwhelming qualifications may bear on the reliability of his proffered testimony, they are by no means a guarantor of reliability." *Id.* at 1261. Thus, "one may be considered an expert but still offer unreliable testimony." *Id.* (citation omitted).

First, Defendants argue Johnson is not a qualified expert on brakes, pre-trip inspections, and maintenance of commercial motor vehicles. Plaintiffs, however, assert Johnson possesses the requisite knowledge, skill, experience, training, and education to provide his opinions. (Doc. 102, p. 13).

Johnson is a Registered Professional Engineer with the state of Alabama and a fully accredited traffic accident reconstructionist. (Doc. 98-1, p. 2). He is a member of numerous professional societies, including the Society of Automotive Engineers, National Society of Professional Engineers, and American Society of Mechanical Engineers. (Doc. 98-1, p. 2). Additionally, he has attended many conferences and courses on accident reconstruction. (Doc. 98-1, pp. 3-5). Johnson is currently employed as the Managing Engineer for Vista Engineering Accident Reconstruction. (Doc. 98-1, p. 5).

Admittedly, Johnson has acknowledged that he has no certifications as a brake inspector, and he does not hold himself out to be a brake expert. (Doc. 94-6, p.

14). However, Johnson contends the reason he does not consider himself to be a "brake expert" is because he does not have the equipment to dismantle tractor-trailers—not because he lacks the knowledge to evaluate tractor-trailer brake systems. (Doc. 94-6, p. 14). Aside from his professional resume, Jackson asserts his qualifications also stem from his upbringing: his grandfather owned a trucking store and a Goodyear Tire store, so he has performed numerous "brake jobs" on a variety of vehicles. (Doc. 94-6, p. 14). Johnson has also worked various collision sites and evaluated trucks with brake drum damage and other associated destruction. (Doc. 94-6, pp. 14-15). However, Johnson does not claim to have any expertise in compliance with the Federal Motor Carrier Safety Regulations. (Doc. 94-6, p. 15). He does not have a commercial driver's license, and he does not perform pre-trip inspections on tractor-trailers. (Doc. 94-6, p. 15). Jackson has, however, partaken in speaking engagements about various aspects of performing a proper pre-trip inspection. (Doc. 94-6, p. 20).

"A[n] expert's training does not always need to be narrowly tailored to match the exact point of dispute in a case." *Parrish v. Ford Motor Co.*, 2007 WL 9709775, at *2 (S.D. Ga. Apr. 27, 2007) (citation omitted). Johnson's qualifications are not particularly impressive in regard to brake inspections and failures, "but any deficiencies in his training and experience, standing alone, do not warrant the exclusion of his testimony." *Id.* His knowledge of accident reconstruction and general experience with vehicle braking systems may be at least minimally adequate to qualify him to testify about the brake system on Williams' tractor

trailer. However, though Johnson may be considered an expert, the Court must still evaluate whether his testimony is reliable. *Frazier,* 387 F.3d at 1261 (citation omitted).

### ii. Reliability

With respect to the reliability determination, the court performs a "gatekeeping function." *Chapman*, 766 F.3d at 1304 (citation omitted). In *Daubert*, the Supreme Court recognized four factors for courts to consider when determining whether proffered expert testimony is reliable:

> (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the theory or technique used by the expert has been subjected to peer review and publication; (3) whether there is a known or potential error rate of the methodology; and (4) whether the technique has been generally accepted in the relevant scientific community. *United Fire & Cas. Co. v. Whirlpool Corp.*, 704 F.3d 1338, 1341 (11th Cir. 2013) (citing *Daubert*, 509 U.S. at 593-94).

When assessing reliability, the Court's focus "must be solely on principles and methodology, not on the conclusions they generate." *Chapman*, 766 F.3d at 1305 (quoting *Daubert*, 509 U.S. at 594-95). "'But conclusions and methodology are not entirely distinct from one another,' neither *Daubert* nor Federal Rule of Evidence 702 requires a trial judge 'to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.'" *Chapman*, 766 F.3d at 1305 (citation omitted).

Plaintiffs assert Johnson has provided succinct analysis in reaching his conclusions, and thus, his opinions are reliable. (Doc. 102, pp. 1-3). The Court disagrees.

In this case, Johnson opines that the right-rear brake on Williams' trailer was inoperative prior to the day of the crash because the brake shoe and lining were covered with a layer of dust and dirt. (Doc. 98-2, p. 8). Johnson's determination primarily stems from his evaluation of various photographs of the brake system. However, there is no rational basis upon which the Court can apply the above factors because there is no discernible methodology underlying Johnson's opinions. In his deposition, Johnson conclusively establishes that some of the photographs depicting the brake system are indistinct or unclear. (Doc. 94-6, p. 9) (stating that the photograph of the broken torque arm was "not a good enough picture"); (Doc. 94-6, p. 10) (stating, "I don't think this photograph is good enough to tell," and "I would like a better picture." in response to questioning about the timing of the broken torque arm). Based on this testimony and the findings in his report, Johnson's methodology appears to have predominantly consisted of looking at photographs of the brake system and generally guesstimating there was a connection between the appearance of certain colors on a still image with the alleged presence of debris on the brake system. Furthermore, to the extent Plaintiffs' contend Johnson's methodology is sound, Johnson's testimony and expert report reveal the potential error rate of the methodology. In his report, Johnson concludes the discoloration in the braking system is a covering "layer of dust and dirt." (Doc. 98-2, p. 8). However, in his deposition, Johnson testified the discoloration was "red clay" and "akin to mud," but it did not look like "asbestos dust or whatever these friction materials are made out of now." (Doc. 94-6, p. 12). Johnson's inability to succinctly opine on which

material, if any, was located on the braking system tends to show the deficiency in his simple visual-inspection methodology. There are no facts in the report or his deposition testimony to suggest Johnson ever performed any tests or reviewed nay other objective information to determine what, if any, material had accumulated on the trailer's braking system. In the absence of any additional evidence or explanation, Johnson's report fails to establish the existence of any debris on the braking system prior to the accident.

Moreover, Plaintiffs believe Johnson's testimony should stand as reliable because Courts have held an expert's methodology of depending on photographs to form his opinions is nevertheless dependable. However, Plaintiffs' comparative case is factually indistinguishable from the facts of this case. *See, e.g., Travelers Prop. Casualty Co. of America v. All-South Subcontractors, Inc.*, 2018 WL 1787884 (S.D. Ala. Apr. 13, 2018) (aside from pictures, expert's inspection of the warehouse at issue also involved a thorough walkthrough and recitation of exact measurements). Admittedly, Johnson did not perform a scene inspection where the accident occurred. He, instead, parked there "for a little while" and did a drive-through. (Doc. 94-6, p. 6). While Johnson may be qualified to give his opinions, there is no indication in the record that his proffered opinions are reliable.

Plaintiffs also argue Defendants allegedly failed to maintain the tractor-trailer parts in order for Plaintiffs to inspect them. Even assuming Defendants were somehow derelict in their effort to provide or maintain additional evidence for Johnson (*See* Doc. 102, p. 6), their failure does not relieve Plaintiffs of their burden

of establishing the reliability of Johnson's opinions under Rule 702. As noted in Defendants' Reply, and this Court agrees, Plaintiffs have borne their own risk in failing to actively seek out evidence. (Doc. 105, p. 8). Based on the materials in the record, Plaintiffs have failed to meet their burden of reliability. Accordingly, the Court need to reach the question of whether Johnson's testimony is relevant to the issues of this case. Furthermore, Defendants' argument with respect to the untimeliness of Johnson's declaration and additional opinions is rendered moot. (Doc. 105, p. 9). Thus, Defendants' motion to exclude the proffered expert testimony of Gary Johnson is due to be granted, and Johnson's testimony will not be admitted into evidence in this case or considered in conjunction with the motion for summary judgment.

## V. Motion for Summary Judgment

### A. Standard of Review

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c) ("Rule 56"). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the nonmoving party to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has

the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) (footnote omitted)). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determination of the truth of the matter. Instead, evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). The mere existence, however, of any factual dispute will not necessarily compel denial of a motion for summary judgment; rather, only material factual disputes preclude entry of summary judgment. *Lofton v. Secretary of Dep't of Children and Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004).

**B. Analysis**

**i.    Choice of Law**

The parties concur this action is controlled by Georgia substantive law, and the Court agrees. In cases proceeding under diversity jurisdiction, federal courts apply the law of the forum in which it sits. *Broyles v. Bayless*, 878 F.2d 1400, 1402 (11th Cir. 1989) (citation omitted). Alabama follows the principle of *lex loci delicti* for tort cases, so the Court applies the substantive law of the state where the injury occurred. *Fitts v. Minnesota Min. & Mfg. Co.*, 581 So.2d. 819, 820 (Ala. 1991) (citations omitted). Smith's alleged injuries occurred in the state of Georgia, and therefore, Georgia substantive law applies to Plaintiffs' claims.

### ii. Punitive Damages (Count 3)

Plaintiffs do not oppose Defendants' motion for summary judgment on their claim for punitive damages. Because they no longer purse any theory against Defendants based on willfulness or wantonness, Defendants' motion for summary judgment on Plaintiffs' claim for punitive damages is due to be granted.

### iii. Defendant Liquid Transport's Vicarious Liability for William's Negligence (Count 4)

Defendants have moved for summary judgment on Plaintiffs' claims of vicarious liability against LTC, arguing: (1) Plaintiffs have no evidence Williams breached a duty owed to Smith; (2) Plaintiffs have no evidence Williams or LTC's mechanic negligently inspected the tractor-trailer's breaks; and (3) Plaintiffs are unable to establish the accident was the cause in fact or proximate cause of Smith's carotid stenosis, need for carotid surgery, or stroke. The Court evaluates each argument in turn.

### a. Negligent Operation of the Tractor-Trailer

Defendants contend Plaintiffs have not presented sufficient evidence that Williams breached a duty owed to Smith while operating his tractor-trailer. After a thorough review of the record, the Court agrees.

In order to have a viable negligence action, a plaintiff must show "the existence of a duty on the part of the defendant, a breach of that duty, causation of the alleged injury, and damages resulting from the alleged breach of duty." *Rasnick v. Krishna Hospitality, Inc.*, 289 Ga. 565, 566 (Ga. 2011) (citations omitted).

Defendants argue Plaintiffs are unable to establish that Williams breached a duty owed to Smith. (Doc. 90, p. 19).

In Georgia, a driver's negligence in a rear-end collision is "not to be presumed [but] is a matter for affirmative proof." *Davis v. Sykes*, 265 Ga.App. 375, 376 (Ga. App. 2004) (citation omitted). "Rear-end collision cases are particularly well suited for jury determination...except in those rare circumstances when a party admits liability, or the facts are undisputed." *Beckett v. Monroe*, 249 Ga.App. 615, 616 (Ga. App. 2001) (citation omitted). As explained by the Supreme Court of Georgia:

> All drivers of vehicles using the highways are held to the exercise of due care.... The driver of the leading vehicle must exercise ordinary care not to stop, slow up, nor swerve from his course without adequate warning to following vehicles of his intention so to do. The driver of the following vehicle, in his turn, must exercise ordinary care to avoid collision with vehicles, both those in front and those behind him. Just how close to a vehicle in the lead a following vehicle, ought, in the exercise of ordinary care, be driven, just what precautions a driver of such a vehicle must in the exercise of ordinary care take to avoid colliding with a leading vehicle which slows, stops, or swerves in front of him, just what signals or warnings the driver of a leading vehicle must, in the exercise of due care, give before stopping or slowing up of his intention to do so, may not be laid in any hard and fast or general rule. In each case except when reasonable minds may not differ, what due care required, and whether it was exercised, is for the jury. *Atlanta Coca-Cola Bottling Co. v. Jones*, 236 Ga. 448, 450 (Ga. 1976) (citation omitted).

The issue of negligence only becomes a question of law for the court to determine when the alleged negligent conduct is susceptible to only one inference. *Hendrix v. Sexton*, 223 Ga.App. 466 (Ga. App. 1996).

Construing the facts in the light most favorable to Plaintiffs, the Court finds that the case at hand is one where reasonable minds would not differ. Williams and

Smith were both traveling northbound on Interstate 75 in Catoosa County, Georgia when Williams rear-ended Smith while exiting towards a weigh station. (Doc. 94-2, p. 13). The posted speed limit on the interstate is 70 miles per hour, and Williams testified that he was driving below the speed limit. *Id.* At some point during the commute, Smith passed Williams. *Id.* Smith later proceeded to get in front of Williams as each prepared to exit for the weigh station. *Id.*

While Smith was preparing to exit, Williams saw Smith's brake lights illuminate. *Id.* At that point in time, Williams began pressing his brake pedal. *Id.* Williams testified that the traffic in the two lanes beside him "had quite a few cars in it," but he felt there "was more than enough safe distance" between him and Smith. *Id.* When he realized that his tractor-trailer was not slowing down as fast as it should have been, Williams started applying more pressure on the brakes, even to the point that he could see smoke coming from his tires. *Id.* He stood on the brake pedal as hard as he could but was unable to avoid impact with Smith's tractor-trailer. *Id.* at pp. 13-14. Williams said he tried to lessen the impact with Smith's vehicle by hitting Smith at an angle. *Id.* at p. 14. He also testified that there were no feasible alternative options because there was too much traffic in the lanes on his left, and he would have rolled the vehicle if he had taken the shoulder to his right. *Id.* at pp. 13-14.

Though Plaintiffs do not dispute the facts concerning Williams' manner of operating the tractor-trailer, they contend the evidence establishes Williams was following too closely behind Smith. However, there is nothing in the record that

could form the basis for even an inference that Williams failed to exercise due care to avoid rear-ending Smith's tractor-trailer. Plaintiffs have provided no evidence or indication that the collision occurred in any manner different than Williams' version of events. In fact, Plaintiffs emphatically agree Williams was "too far behind Smith to tell whether he was coming to a complete stop." (Doc. 94, p. 6). Plaintiffs have not offered any evidence to contradict Williams' evidence concerning the distance between Williams and Smith, the rate of speed in which Williams was traveling, the traffic condition of the highway, or any other circumstances upon which a jury could reasonably infer that Williams was following Smith's tractor-trailer too closely.

Thus, the Court finds that Williams was traveling at a safe rate of speed and that he attempted to stop the vehicle by applying his brakes at or about the time he realized Smith was slowing down. There was no negligent act of either omission or commission on his part in operating the vehicle, but rather, an exercise of reasonable care. He acted with all prudence in attempting to stop the vehicle before rear-ending Smith. Any endeavor to miss Smith's tail end by swerving into congested lanes of traffic or risking the possibility of having his own tractor-trailer overturn would have been unwise. While hindsight cannot confirm that either option would have been unsuccessful, neither can it retroactively convert prudence into negligence.

In response to Defendants' motion for summary judgment, the burden was on Plaintiffs to present some evidence to establish a question of fact. This they have

failed to do.  Therefore, Defendants' motion for summary judgment is due to be granted with respect to Plaintiffs' claim on the issue of negligent driving.

### b. Negligent Inspection of the Tractor-Trailer's Brakes

Defendants argue the evidence is insufficient to establish Williams or LTC failed to exercise due care in inspecting the brakes on Williams' tractor-trailer. In conjunction with its motion for summary judgment, Defendants also move to exclude the proffered opinions of Plaintiffs' expert, Gary Johnson. (Doc. 98). As determined *supra*, Johnson's testimony is unreliable, and thus, his opinions will not be considered in conjunction with this motion for summary judgment. After a thorough review of the record, the Court cannot conclude Defendants negligently inspected the tractor-trailer prior to the collision.

Defendants aver it is undisputed that the right-rear break drum on Williams' tractor-trailer was missing following the accident. (Doc. 90, p. 19). A few weeks before the accident, the tractor-trailer underwent its 90-day periodic inspection. (Doc. 94-1, p. 19). Additionally, the day before the accident, the tractor trailer was involved in a safety lane inspection. *Id.* Both inspections included checking the brake system. *Id.* Furthermore, the labor involved in the safety lane inspection included adjusting the tractor-trailer's brakes. *Id.* at pp. 23-24.  According to LTC's mechanic, Ron Worsham, a brake adjustment cannot be done if there is a missing brake drum, and it is impossible for a mechanic performing a brake adjustment to overlook a missing brake drum (if in fact a section of the brake drum was broken and missing). (Doc. 88-8 ¶ 12). LTC's inspection guides and annual reports did not

contain any indication there was some sort of defect in Williams' tractor-trailer at the time of the accident. (Doc. 94-1, p. 23).

On the day of the accident, Williams testified the brakes had been functioning normally, and he had not encountered any difficulty stopping the vehicle. (Doc. 94-2, p. 14). Williams performed a pre-trip inspection, which included performing a brake test, and the brakes "felt fine." *Id.* Moreover, Williams had never experienced any problems or observed any complications with the tractor-trailer's brake system prior to the accident. *Id.* at p. 16. Furthermore, throughout the course of his ownership of the tractor-trailer, an inspection has never revealed any issue with the brakes. *Id.*

On the afternoon of May 5, 2015, LTC towed the tractor trailer to its Cartersville, Georgia terminal to perform a post-accident inspection. (Doc. 88-8 ¶ 4). Ron Worsham ("Worsham"), LTC's foreman and head mechanic at the Cartersville terminal, inspected the tractor-trailer. *Id.* Worsham is a qualified "brake inspector" under the Federal Motor Carrier Safety Regulations, 42 C.F.R § 396.25. *Id.* at ¶ 3. Upon his inspection, he determined the trailer's right-rear wheel did not have a complete break drum. *Id.* at ¶ 5. He explains a substantial portion of the brake drum had broken off and was missing. *Id.*

Worsham directed one of LTC's commercial mechanics, Scott Herod ("Herod"), to remove the right-rear tire so they could examine the trailer's brake chamber and take photographs. *Id.* at ¶ 6. Herod is also a qualified "brake inspector" under the Federal Motor Carrier Safety Regulations, 42 C.F.R § 396.25.

*Id.* Once the tire was removed, Worsham noticed the portion of the brake drum which is needed for the brake to function was missing. *Id.* at ¶ 7. Moreover, the broken portion of the brake drum edge was noticeably lighter in color than the unbroken surfaces of the drum that remained. *Id.* at ¶ 8. Over the years, Worsham has evaluated many broken brake drums, and in his experience, the lighter color on the brake drum is due to oxidation (i.e. rust), which occurs quickly whenever the edge of a drum breaks. *Id.* at ¶ 9. Accordingly, Worsham determined the brake drum had recently broken off, within at most a few hours—and certainly less than twenty-four hours before—the accident's occurrence. *Id.*

Worsham also determined there was no built-up of dirt or mud on the wheel or inside the brake chamber. *Id.* at ¶ 10. He declares the reddish/brownish coloration in the photos is a combination of oxidation, heat marks from friction, and the lighting conditions that casted shadows. *Id.* Additionally, he determined the material inside of the brake pad rivet holes was accumulated brake dust that is normally seen inside of a brake chamber. *Id.* Worsham also explained that it is not uncommon for brake drums to overheat to the point of failure during hard braking situations, so brake drums that show no visible signs of cracks or damage may nevertheless fail during operation without warning. *Id.* at ¶ 13.

Plaintiffs, however, contend the brake drum defect existed on the trailer before the pre-accident inspections performed by LTC's mechanic and Williams. (Doc. 94, p. 12). Accordingly, Plaintiffs assert that both the mechanic and Williams negligently failed to discover the defects during their inspections preceding the

accident. *Id*. The only evidence Plaintiffs have proffered to support their claim of negligent inspection is the deposition testimony and expert opinions of Gary Johnson. However, as demonstrated in Defendant's motion to strike Johnson's testimony, Johnson's proffered opinions in regard to the condition of the trailer's braking system are inadmissible as unreliable expert testimony.

Consequently, Plaintiffs have failed to provide a sufficient showing on an essential element of their case, and Defendants are entitled to summary judgment with respect to Plaintiffs' claims on the issue of negligent inspection.

### c. Causation of Smith's Post-Operation Stroke

Defendants argue that the accident was not the cause in fact or proximate cause of Smith's carotid stenosis, need for carotid surgery, or stroke. (Doc. 90, p. 14). Plaintiffs, however, assert Defendants' contentions are disputable and must be resolved by a jury at trial. (Doc. 94, p. 29).

As noted *supra*, the elements of a negligence cause of action are: duty, breach, causation, and damages. *Rasnick v. Krishna Hospitality, Inc.*, 289 Ga. 565, 566 (Ga. 2011) (citations omitted). The gravamen of Defendants' motion for summary judgment on Plaintiffs' claim of vicarious liability is the lack of proof for causation. Specifically, Defendants assert Plaintiffs cannot effectively prove the accident was the proximate cause of Smith's stroke.

Proximate cause is "that which, in the natural and continuous sequence, unbroken by other causes, produces an event, and without which the event would not have occurred." *Georgia Dept. of Transp. v. Owens*, 330 Ga.App. 123, 130 (Ga.

App. 2014) (citation omitted). "The requirement of proximate cause constitutes a limit on legal liability; it is a policy decision that, for a variety of reasons, e.g., intervening act, the defendant's conduct and the plaintiff's injury are too remote for the law to countenance recovery." *Id.* (citation omitted). Accordingly:

> The plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to grant summary judgment for the defendant. *Grinold v. Farist*, 284 Ga.App. 120, 121-22 (Ga. App. 2007) (citation omitted).

Questions regarding proximate cause are reserved for the jury unless the case in front of the court is "plain and undisputed." *Ontario Sewing Machine Co., Ltd. v. Smith*, 275 Ga. 683, 687 (Ga. 2002) (citations omitted).

Defendant contends Plaintiffs have not shown the accident was the proximate cause of Smith's stroke because 1) Smith's need for carotid surgery was not caused by the accident; 2) his carotid artery blockage pre-existed the accident; 3) the accident did not exacerbate the carotid blockage or complicate the surgery; 4) stroke is a known risk of carotid surgery; and 5) surgery caused the stroke. (Doc. 90, p. 16).

In response, Plaintiffs do not dispute that Smith had a pre-existing carotid condition or that he needed surgery for the condition. (Doc. 94, p. 18). Plaintiffs' argument is that the accident initiated Smith's cervical strain; the strain required physical therapy treatment; Smith wanted to continue physical therapy; in order to

continue the treatment, he had to have surgery to treat his carotid condition; and the surgery caused the stroke. *Id.*

In this case, the finding of proximate cause rests in the determination of whether or not Smith was required to have surgery in order to continue his physical therapy sessions. However, such a finding is not capable of resolution by an ordinary person using common knowledge and experience; the question can only be answered in connection "with the practice or study of medicine." *Cowart v. Widener*, 287 Ga. 622, 627 (Ga. 1010).

The parties present the medical opinions and evaluations of Smith's treating physicians, Dr. Thomas Bernard and Dr. John Streitman. The Eleventh Circuit has explained, "The testimony of treating physicians presents special evidentiary problems that require great care and circumspection by the trial court." *Williams v. Mast Biosurgery USA, Inc.*, 644 F.3d 1312, 1316 (11th Cir. 2011). "Under controlling Eleventh Circuit precedent interpreting Rule 701, a treating physician testifying as a lay witness is limited to his or her observations based on personal knowledge." *Cooper v. Marten Transport, Ltd.*, 2014 WL 11517830 at *2 (N.D. Ga. May 23, 2014) (citing *Williams*, 644 F.3d at 1317-18). Accordingly, a treating physician may offer his or her opinion when the opinion is "based on his experience as a physician and [is] clearly helpful to an understanding of his decision-making process in the situation." *Williams*, 644 F.3d at 1317 (citation omitted). However, "when a treating physician's testimony is based on a hypothesis, [and] not the experience of treating

the patient, it crosses the line from lay to expert testimony, and it must comply with the requirements of Rule 702 and the strictures of *Daubert*." *Id.* at 1317-18.

Dr. Thomas Bernard, an orthopedic surgeon, evaluated Smith on July 30, 2015 for complaints of neck stiffness and pain. (Doc. 94-7, pp. 4-5). Prior to seeing Dr. Bernard, Smith had undergone a cervical MRI scan, which he brought to Dr. Bernard for his review. *Id.* at p. 5. After evaluating Smith's MRI, Dr. Bernard diagnosed him with a cervical strain. *Id.* at p. 6. He recommended Smith take physical therapy, and he provided Smith anti-inflammatory medication. *Id.* During Smith's physical evaluation, Dr. Bernard detected an abnormal sound through his stethoscope. *Id.* at p. 7. Dr. Bernard explained the sound indicated an abnormal flow of blood, which usually means there is a narrowing of the carotid arteries. *Id.* Dr. Bernard informed Smith he heard the abnormal sound, and Smith told Dr. Bernard he was aware he had carotid disease. *Id.* Though Dr. Bernard was aware of Smith's medical condition, he testified that he did not have any concerns about Smith taking physical therapy with his carotid condition nor did he think physical therapy presented a great risk to Smith's carotid condition. *Id.* at p. 8.

Smith's other treating physician, Dr. John Streitman, first evaluated Smith in 2013 when he performed Smith's coronary bypass surgery. (Doc. 94-3, p. 5). At the time of his bypass surgery, a CT scan revealed Smith had carotid disease. *Id.* In April 2015, Smith visited Dr. Streitman for a follow up appointment, at which time Dr. Streitman testified Smith's carotid condition was asymptomatic. *Id.* at p. 6. Dr. Streitman explained common symptoms of carotid stenosis include transient

ischemic attack, stroke, and loss of vision. *Id.* Though Smith was not exhibiting any symptoms at that time, Dr. Streitman testified that he recommended Smith undergo a left carotid endarterectomy to reduce Smith's risk of stroke. *Id.*

Smith visited Dr. Streitman again in June 2015, approximately one month after the accident, to follow up about his carotid condition. *Id.* at p. 7. Dr. Streitman testified that he spoke with Smith about the risks and benefits of having an endarterectomy, and Smith understood. *Id.* at pp. 7-8. Dr. Streitman performed Smith's endarterectomy on September 2, 2015 that resulted in a post-operation stroke. *Id.* at pp. 11-13. When questioned about the connection between Smith's physical therapy treatment and the endarterectomy, Dr. Streitman testified to the following in his deposition:

> Q:     Would you agree that someone with carotid stenosis like Mr. Smith should not receive physical therapy to their neck or manipulations to their neck because of that carotid stenosis?
>
>        Mr. Waudby: Object to the form.
>
> Q:     You can answer.
>
> A:     I am not aware of any contraindication to physical therapy in patients who have carotid disease. *Id.* at p. 13.

Dr. Streitman also testified:

> Q.     Okay. Did Mr. Smith ever relay to you that he was undergoing physical therapy or anything of that nature?
>
> A.     I don't believe so, no.
>
> Q:     If he had told you that he was undergoing physical therapy, would that have changed your recommendation with respect to the endarterectomy?
>
> A:     I don't think so. *Id.* at pp. 21-22.

Furthermore, Dr. Streitman explained that Smith's endarterectomy was an "elective operation," and he elaborated, "I wouldn't have mandated that he get physical therapy prior to me offering him surgery." *Id.* at p. 22.

Plaintiffs' response to Defendant's motion for summary judgment relies heavily on the deposition testimony of Smith's physical therapist, Thomas Rider. Plaintiffs contend Rider's testimony presents sufficient evidence for a jury to conclude Smith's stroke was proximately caused by Smith's attempts to get physical therapy treatment for his cervical strain. Rider evaluated Smith for neck pain and stiffness secondary to the accident. (Doc. 94-5, p. 5). During Rider's deposition, he testified that Smith's therapy was discontinued because of an issue with Smith's carotid artery. *Id.* at pp. 5-6. However, it "apparently wasn't clear to" Rider whether Smith would come back to therapy because of the carotid surgery. *Id.* at p. 6. When asked about the reasoning for discharging Smith, Rider explained:

Q:     Tell me, as a physical therapist, why blockage or an issue with a carotid artery would be a reason to cease therapy or discharge them?

           Mr. Waudby: Object to the form.

A:     I don't think the decision was even my decision. I think it was – I'm foggy on exactly that. He wasn't in the room with me. *Id.* at p. 7.

Ultimately, Rider was unable to provide specific details regarding his conversation with Smith. *Id.* However, during an exchange involving a hypothetical scenario, Rider testified:

Q:     If someone told you that they had an issue, such as blockage of the carotid artery –

A:      Right.

Q:      – would that be a good enough reason to discharge them –

A:      Yes.

           Mr. Waudby: Object to the form.

Q:      And so here, if Mr. Smith had told you that, is that something that you would have expected that you would have done?

           Mr. Waudby: Object to the form.

A:      That – That makes senses to me. *Id.* at p. 8.

Yet, Rider also testified on cross examination to the following:

Q:      Okay. Did you ever tell Mr. Smith that he must get surgery on his coronary or his artery condition before he could resume any physical therapy with you?

           Mr. Marsh: Object to form

A:      No, I didn't do that.

Q:      Did you recommend to Mr. Smith that he go get surgery done on his arteries to remove plaque buildup? Did you ever make that recommendation to him?

           Mr. Marsh: Object to the form.

A:      No, sir. *Id.* at p. 14.

Furthermore, Rider testified that it is not his role in his position as a physical therapist to make recommendations regarding medical surgeries for artery conditions. *Id.*

In viewing the evidence in the light most favorable to Plaintiffs, the medical testimony presented nevertheless establishes that Smith was not required to undergo surgery in order to continue physical therapy. Rider's testimony as to

probability versus possibility of a causal relationship is based on lay conjecture and speculation. His testimony is equivocal at best. As demonstrated in his deposition testimony, Rider's experience as Smith's physical therapist is not helpful in understanding his decision-making process in Smith's situation, and his opinions are not grounded in his own observations. *See Williams*, 644 F.3d at 1317 (citation omitted). In fact, Plaintiffs concede that Rider does not recall his specific interactions with Smith, and his testimony waivers on what could have possibly occurred. (Doc. 94, p. 19). However, the mere possibility of causation is not enough. *Grinold v. Farist*, 284 Ga.App. 120, 121-22 (Ga. App. 2007) (citation omitted). "If the damage incurred by the plaintiff is only the imaginary or possible result of a tortious act or if other and contingent circumstances preponderate in causing the injury, such damage is too remote to be the basis of recovery against the wrongdoer." GA. CODE ANN. § 51-12-8 (2018). Defendants have presented medical testimony establishing that Smith's physician did not mandate Smith to have a carotid endarterectomy in order for him to continue physical therapy, and Rider did not tell Smith to have the procedure in order to resume physical therapy. Plaintiffs' "possibility" evidence does not establish the fact that Smith was required to undergo surgery in order to continue physical therapy.

Moreover, Plaintiffs' application of the six principles of Georgia causation law are irrelevant and/or unpersuasive to the facts of this case. First, Plaintiffs argue proximate cause is traditionally an issue for the jury when the case involves "the concurrent negligence of several actors." (Doc. 94, p. 13) (citing *Amu v. Barnes*, 650

S.E. 2d 288, 293 (Ga. App. 2007)). This principle is irrelevant to the facts of this case. Moreover, Plaintiffs disregard the *Amu* Court's concurrent finding that, "[T]here can be no proximate cause where there has intervened between the act of the defendant and the injury to the plaintiff, an independent, intervening act of someone other than the defendant, which was not...triggered by defendant's acts, and which was sufficient of itself to cause the injury." *Amu*, 650 S.E.2d at 293. Thus, even if the intervening cause theory were relevant to this case, the evidence establishes that Smith's post-operation stroke was not triggered by Defendants' acts. Smith's physicians did not believe physical therapy was harmful to his carotid condition, and the surgery was not necessary in order for Smith to continue the therapy. Furthermore, it is well settled under Georgia law that "a patient's own actions constitute an intervening cause as a matter of law where the patient consciously ignores a problem and allows it to worsen." *Amu*, 650 S.E. 2d at 294 (citing *Eldred v. Blue Cross & Blue Shield of Ga.*, 274 Ga. App. 798 (Ga. App. 2005). Thus, Plaintiffs assertions under the intervening cause theory are implausible.

Next, Plaintiffs contend Georgia law allows recovery for aggravation of a preexisting condition. (Doc. 94, p. 13) (citing G.S.P.J.I. (Civ.) No. 66. 504). However, there is no evidence that the accident resulted in any aggravation of Smith's preexisting carotid condition. At best, Plaintiffs' contention is that the carotid endarterectomy aggravated Smith's preexisting condition. Therefore, Plaintiffs' argument is misplaced and immaterial.

Third, Plaintiffs argue Defendants are liable for all injuries that result as a natural and reasonable consequence of their negligence. (Doc. 94, p. 14) (citing *Coleman v. Atlanta Obstetrics*, 390 S.E.2d 856, 858 (Ga. App. 1990)). Yet, as demonstrated under Plaintiffs' intervening cause theory, Smith's election to have surgery was of no consequence to the neck injury Smith sustained following the accident. Thus, Defendants could not be held liable for any resulting damage from the surgery. Furthermore, for similar reasons, Plaintiffs' argument under the thin skull doctrine also fails. (*See* Doc. 94, p. 14) (citing *Cowart v. Widener*, 697 S.E.2d 779, 784-85 (Ga. 2010)).

Plaintiffs fifth causation principle rests in the argument that a defendant is not only liable for the injury caused by his own acts, but he is also liable for any additional bodily harm resulting from the normal efforts of third persons rendering aid which the plaintiff's injury reasonably requires. (Doc. 94, p. 14) (citing Rest. (2nd) Torts § 457). However, the record establishes Smith's neck injury (and subsequent physical therapy) did not reasonably require Dr. Streitman's efforts in performing the carotid endarterectomy.

The final causation theory on which Plaintiffs rely is the principle that proximate cause is a mixed question of law and fact. (Doc. 94, p. 15) (citing *Amu*, 650 S.E.2d at 295). Plaintiffs assert the question of "what happened" and whether those facts "measure up to the legal standard set by precedent" are determinations that should be made by the jury upon appropriate instructions from the judge. *Id*. Plaintiffs, however, have not presented any dispute of material fact regarding "what

happened" in terms of causation, and as such, there is no issue of fact for the jury to decide.

In sum, Plaintiffs' evidence does not rebut or undermine Defendants' affirmative evidence on causation. Therefore, Defendants' motion for summary judgment is due to be granted with respect to Plaintiffs' claims on the issue of causation.[1]

### iv.    Damages for Past and Future Medical Care Expenses

The Court need not evaluate the parties competing arguments regarding Plaintiffs' claims for past and future medical expenses. Because the Court has rejected Plaintiffs' causation argument and concluded that, based on the evidence in the record, the accident was not the cause in fact or proximate cause of Smith's carotid stenosis, need for carotid surgery, or stroke, the issue of special damages is rendered moot.

## VI. Conclusion

For the reasons stated above, the Court hereby **GRANTS** Defendants Liquid Transport Corporation and Great West Casualty Company's motion to exclude proffered expert opinions of Gary Johnson. (Doc. 98). Additionally, Defendants' motion to strike certain testimony of Irma Smith is **GRANTED**. (Doc. 97). Furthermore, the Court finds there is no genuine dispute as to any material fact,

---

[1] The evidence reveals Defendant LTC cannot be held vicariously liable for Plaintiffs' claims of negligence against Williams. Accordingly, Plaintiffs are likewise unable to maintain a direct cause of action against LTC's indemnity insurer, Great West Casualty Company. Thus, Defendant's motion for summary judgment is due to be granted in favor of Defendants on Count 6 of the Complaint. (*See* Doc. 30).

and Defendants are entitled to judgment as a matter of law. Accordingly,

Defendants' motion for summary judgment is **GRANTED**. (Doc. 88).

      **DONE** and **ORDERED** this 13th day of July, 2018.

/s/ Callie V. S. Granade
SENIOR UNITED STATES DISTRICT JUDGE